## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BRIGGITTA HARDIN**,
3450 Toledo Terrace
Apartment 316
Hyattsville, MD 20782

       Plaintiff,

      v.

**MICK DADLANI**, individually and in his
capacity as Redline Owner and Manager,
2114 North Capitol Street St. NW
Washington, D.C. 20002


**RED LINE DC, LLC**,
2114 North Capitol Street St. NW
Washington, D.C. 20002

       Defendants.

Case No. _____

## COMPLAINT

## NATURE OF ACTION

1.     Plaintiff Briggitta Hardin ("Plaintiff" or "Ms. Hardin") brings this action against her former employer, Red Line DC, LLC ("Redline") and Mick Dadlani, owner and manager of Redline bar, lounge, and restaurant ("Defendants"), for unlawful discrimination on the basis of her race in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.*, as amended, ("Section 1981") and the District of Columbia Human Rights Act, DC Code § 2-1401.01 ("DCHRA").

2.     Ms. Hardin, an African-American woman and experienced bartender, was hired in late fall 2010 to fill a much-needed bartender position at Redline, a Washington D.C. bar,

lounge, and restaurant.  Upon discovering that his staff had hired an African-American bartender, Defendant Mick Dadlani, owner and manager of Redline, appeared disgusted and Ms. Hardin was fired on the spot.

3.      Defendants' discriminatory denial of employment to Ms. Hardin was part of a broader scheme of discriminatory exclusion perpetrated by Redline and Defendant Dadlani.  In pursuit of Defendants' vision of Redline as maintaining a white, homogeneous customer base, Redline and Dadlani implemented discriminatory policies that excluded African Americans from working in visible positions and denied African-American customers equal access to the establishment.  Through their discriminatory practices, Defendants ensured that its bartenders and servers were overwhelmingly white.  Defendants' decision to terminate Ms. Hardin is a reflection of these discriminatory practices.

4.      On the basis of the violations asserted herein, Ms. Hardin seeks compensatory and punitive damages to redress the injuries she suffered as a result of Defendants' unlawful discrimination.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 28 U.S.C. § 1367.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims occurred in the District of Columbia and because at all relevant times Defendants Redline and Dadlani were doing business in the District of Columbia.

**PARTIES**

7.      Plaintiff Briggitta Hardin is an African-American resident of Maryland.  At the

time of the events, Ms. Hardin was a student at Howard University majoring in Communications.

In addition to her work-study job, Ms. Hardin sought to work at least half-time as a bartender to

finance her education.  To that end, in the fall of 2010, she sought a second part-time job at

Redline to help pay for tuition and books.  Ms. Hardin also worked as a bartender at Bar Louie, a

restaurant and lounge located across the street from Redline.  At the time of her employment

with Redline, Ms. Hardin already possessed four years of experience in serving and bartending.

She was employed with Redline from late November 2010 until early December 2010.

8.      Defendant Red Line DC, LLC is a District of Columbia corporation registered to

do business in the District of Columbia.  Red Line DC, LLC owns and/or operates the Redline

bar, lounge and restaurant located at 707 G St. NW in Washington, D.C.

9.      Defendant Mick Dadlani is the primary owner and operational manager of the

Redline bar, lounge, and restaurant located at 707 G St. NW in Washington, D.C.  At all relevant

times, Defendant Dadlani was responsible for day-to-day operations and management decisions

regarding Redline, including the retention, hiring and/or termination of employees.  Defendant

Dadlani is the registered agent of Red Line DC, LLC.

**FACTUAL ALLEGATIONS**

10.      When Briggitta Hardin, a student at Howard University, sought a second part-

time job to help finance her education, she brought to the table a wealth of experience as a server

and bartender in Washington, D.C.  At the time she learned of available bartending opportunities

at Redline, Ms. Hardin already possessed four years of bartending experience, including

experience working in the busy "Chinatown" neighborhood of Washington, D.C. where Redline

3

is located. Indeed, at the time Ms. Hardin applied for a position at Redline, she was already bartending at Bar Louie, a restaurant and lounge located across the street from Redline, that provided her with the type of high-volume sales experience and exposure to a high-pressure atmosphere that made her an asset. Ms. Hardin also brought experience transitioning a new bar into a successful enterprise, as she had worked at Bar Louie since it opened its doors.

11.     In November 2010, Ms. Hardin learned that a new restaurant and bar was opening across the street from Bar Louie and was seeking to fill vacant bartender positions. Ms. Hardin understood that Redline was looking to open for business in the coming weeks and had a pressing need to hire experienced employees in order to open as scheduled. Located just steps from the Verizon Center, Redline was posed to be a major player in the Chinatown nightlife.

12.     Excited at the opportunity to work at an up-and-coming establishment like Redline, Ms. Hardin submitted an application. Shortly after completing her application, Ms. Hardin interviewed with two Redline employees. Within days, Ms. Hardin was offered a bartending position by one of the interviewers. Ms. Hardin accepted the position.

13.     Shortly after accepting the job offer, Ms. Hardin completed several hours of training as a Redline employee. The training was conducted by two Redline bartenders.

14.     On December 2, 2010, Ms. Hardin arrived at Redline to assist in preparing the venue for its "Grand Opening" and work her scheduled shift.

15.     Upon entering the restaurant, she encountered Redline owner/manager Mick Dadlani. Ms. Hardin had not met Dadlani up to that point, as her hiring and training had been carried out by other Redline staff. Ms. Hardin introduced herself and extended her hand to greet Dadlani, but Dadlani refused to touch her hand. Instead, Dadlani looked Ms. Hardin up and down with visible disgust and walked away, appearing angered by her presence. Despite being

4

taken aback by the incident, Ms. Hardin proceeded to her work station at the bar where she prepared and cut fruit for drink garnishes.

16.     Within the hour, a Redline staff member approached Ms. Hardin and coldly informed her that she was fired.  Despite being short-staffed and needing all available employees to assist in preparing for the restaurant's Grand Opening, Ms. Hardin was abruptly terminated following her encounter with Dadlani and was advised to leave.  Ms. Hardin's efforts to retain her position at Redline were ignored.  Upon information and belief, the Redline staff member was following the direct instructions of Dadlani.

17.     Employees at the time expressed their dismay at Ms. Hardin's firing, in part because she was well-qualified for the position and also because the restaurant remained short-staffed for several weeks after Ms. Hardin's termination.

18.     At all times relevant to the events described above, employees of Redline were acting within the scope of their employment as employees, agents, and/or representatives of Defendants.  The discriminatory practices described above were carried out: (a) at the direction of and with the consent, encouragement, knowledge, and ratification of Defendants; (b) under Defendants' authority, control, and supervision; and/or (c) within the scope of the employees' employment.

19.     Ms. Hardin was singled out for termination because of her race.  She was both the only African American present at the Grand Opening and the only bartender or server terminated that day.  Upon information and belief, Defendants replaced Ms. Hardin with a white employee.

20.     Employees who witnessed these events immediately recognized that Ms. Hardin's termination was on the basis of her race, and this fact was discussed among the staff.

5

21.     So disgusted by Defendants' discriminatory practices, several Redline employees quit their lucrative employment at Redline because they could not stomach the discrimination by Defendants.

## DEFENDANTS' DISCRIMINATORY POLICIES AND PRACTICES

22.     Ms. Hardin's discriminatory termination reflects Redline's and Mr. Dadlani's discriminatory policies and practices designed to establish Redline as a predominantly Caucasian venue.

23.     As a result of Defendants' discriminatory policies, the bartenders and servers Redline and Dadlani retained to work at Redline were white.

24.     Redline employees recognized that African-American bartenders and/or servers like Ms. Hardin were denied employment because of their race.

25.     Mr. Dadlani indicated to Redline employees that he did not want to hire African-American bartenders or servers because they did not have the "look" he sought to project for Redline.  Instead, Dadlani indicated his desire to employ a young, white, attractive staff to promote his vision of Redline as a white establishment.

26.     When Redline posted an advertisement for an open hiring call on Craigslist, scores of applicants responded, most of whom were African-American.  A former employee who was present reports that Dadlani was furious at the race of the candidates.  Upon information and belief, Dadlani chose not to hire at all from the open call for applicants.

27.     After Ms. Hardin was hired and unceremoniously fired due to her race, Dadlani disallowed managers at Redline from hiring employees and insisted on seeing all candidates before they were hired to prevent the hiring of another African-American employee such as Ms.

Hardin. Dadlani refused to hire another well-qualified African-American woman who had much-needed experience as the head trainer at another restaurant and bar.

28.     When Dadlani did hire non-white employees, he ensured that they were relegated to unseen positions in the establishment and subjected them to humiliating working conditions. Upon information and belief, Dadlani prohibited his mostly Hispanic kitchen crew from leaving the kitchen, lest they be visible on the floor to patrons and disturb the homogenous image of Redline that he had crafted. As a result, Hispanic kitchen workers were forced to cower uncomfortably as they sought to use restroom facilities unnoticed by patrons or to endure physical discomfort as they refrained from utilizing the facilities. At least one kitchen employee was fired by Redline because he came out of the kitchen and could be seen by Redline patrons.

29.     Redline and Dadlani enforced its policies of preferring white employees by unlawfully denying employment to qualified African Americans, including Ms. Hardin.

30.     Redline and Dadlani also engaged in other discriminatory practices to perpetuate this vision of a white Redline. One such practice included closing down the bar early when Dadlani determined that too many of the customers in the establishment were African-American. Former Redline employees report that on a night in May 2011 during the NBA Playoffs, Dadlani closed the bar one hour earlier than the standard "last call." Disgusted by the largely African American crowd that had assembled to watch the game, Dadlani called "last call" despite the objections of some Redline employees that the restaurant was making a lot of money from the crowd of patrons. Dadlani said that he wanted to get "them" out and make sure they had a horrible time so that "they" would not return. The former employees were uniform in their understanding that by "them," Dadlani was referring to the African-American patrons in Redline.

31.     At other times, Dadlani and Redline employed the use of a fictitious guest list to discourage and deny entry to African-American patrons altogether.  Former employees report that Dadlani instructed Redline doormen to use the fictitious list when African Americans attempted entry into the establishment.  Dadlani affirmed his open hostility toward African-American patrons by making comments celebrating the success of the door list, evidenced by Dadlani's approving proclamation that there were only two of "them" in the restaurant during another busy evening.  As he counted, he pointed at each of the two African-American patrons, making clear that "them" referred to African Americans.

32.     Redline employees witnessed Defendants' discriminatory conduct.  Dadlani's treatment of Ms. Hardin, as well as other African Americans he encountered, was observed by other employees and reported among the staff.

33.     Defendants' discriminatory conduct contributed to several employees' decisions to quit their positions at Redline.

### INJURY TO PLAINTIFF

34.     As a result of Defendants' discriminatory conduct, Ms. Hardin has suffered, and in the future will continue to suffer, irreparable loss and injury, including but not limited to, economic loss, humiliation, embarrassment, mental and emotional distress, and the deprivation of her rights to equal employment opportunities.  The discriminatory conduct also interfered with Ms. Hardin's ability to finance her college education at Howard University.

35.     Through Defendant Dadlani's own actions and the actions of Defendants' employees, agents, and/or representatives described above, Defendants acted intentionally, maliciously, oppressively, and with willful, callous, wanton, and reckless disregard for Plaintiff's rights.

8

**CLAIMS FOR RELIEF**

**COUNT I**

**Discrimination under Section 1981 of the Civil Rights Act of 1866**

36.     Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 35 above.

37.     As described above, Defendants' termination of and denial of employment to Ms. Hardin because of her race is in violation of Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, *et seq*.

38.     Through their discriminatory conduct, Defendants deprived Ms. Hardin of her right to make and enforce contracts on the same terms as enjoyed by white persons, in violation of 42 U.S.C. § 1981.

**COUNT II**

**Discrimination under the District of Columbia Human Rights Act**

39.     Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 35 above.

40.     As described above, Defendants' termination of and denial of employment to Ms. Hardin because of her race is in violation of D.C. Code § 2-1402.11.

41.     Through their discriminatory conduct, Defendants discharged and refused to hire Ms. Hardin, and deprived Ms. Hardin of equal employment opportunities because of her race, in violation of the District of Columbia Human Rights Act.

## PRAYER FOR RELIEF

42.     WHEREFORE, Plaintiff prays that this Court grant her the following relief:

a)     enter a declaratory judgment finding that the foregoing actions of Defendants violate 42 U.S.C. § 1981, *et seq.* and D.C. Code § 2-1401.01, *et seq.*;

b)     enter a permanent injunction directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c)     award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiff for the economic loss, humiliation, embarrassment, and mental and emotional distress caused by the conduct of Defendants alleged herein;

d)     award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

e)     award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

f)     order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury as to all issues in this case.

Dated:   November 18, 2011

Respectfully submitted,

John Relman (D.C. Bar No. 405500)
Jennifer Klar (D.C. Bar No. 479629)
RELMAN, DANE & COLFAX, PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)
jrelman@relmanlaw.com
jklar@relmanlaw.com

Emily Read (D.C. Bar No. 492773)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, NW, Suite 400
Washington, D.C. 20036
(202) 319-1000
(202) 319-1010 (fax)
Emily_Read@washlaw.org

*Attorneys for Plaintiff*